PER CURIAM.
 

 This case is before the Court on appeal from a judgment of conviction of first-degree murder and a sentence of death arising from the fatal shooting of John Cardoso during a robbery on December 24, 1997. We have jurisdiction.
 
 See
 
 art. V, § 3(b)(1), Fla. Const. For the reasons that follow, we affirm the conviction and sentence.
 

 I. FACTS AND PROCEDURAL HISTORY
 

 The evidence presented at the trial of appellant Charles C. Peterson established the following. Karen Smith testified that she worked as an assistant manager at a Big Lots in St. Petersburg, Florida, on the evening of December 24, 1997. She testified that while she and two other employees were in the store’s office after the store closed at 6 p.m., she heard a “ruckus.” She explained that when she opened the locked office door, she was immediately confronted by a man pointing a gun at her. Maria Soto, who also worked as an assistant manager at the Big Lots on December 24, 1997, testified that while she was in the office after closing, she heard a noise from the break room that sounded like furniture banging or firecrackers. Soto confirmed that when Smith opened the door to investigate the noise, “[w]e walked right into a man with a nylon stocking [covering his face] and a gun in his hand.” Smith described the man as black, about five feet four inches or five feet six inches tall, weighing 130 to 140 pounds, with “pudgy cheeks.” He wore a “nylon scarf’ over his face and off-white latex gloves. Soto described the man as black, between five feet six inches and five feet eight inches tall, and noted that he wore latex gloves.
 

 Both witnesses testified that the man escorted the three employees from the office through the employee break room into the stockroom. The man held the gun to Smith’s head as they walked. Smith testified that John Cardoso, another employee, was lying on the floor of the break room when they entered. Soto testified that the man forced her and the other employees to step over Cardoso. Once in the stockroom, the three women and Josh McBride, another employee who had entered the stockroom, were made to get down on their hands and knees. Smith testified that the man repeatedly told them to “stay on your hands and knees you bitches and don’t look at me.” Soto testified that the man put the gun to her temple and told her not to look at him. After asking who was in charge, the man pulled Smith to her feet and told the others that “if [they] moved, he will kill her and anyone else.” Smith explained that the robber used her to lure the remaining store employee, Wanda Church, to the back of the store, after which he took Church to the stockroom. The man then forced Smith to go into the office with him. The man took a backpack from the merchandise area of the store and had Smith fill it with money. He stated that he wanted “all of the large money.” He told Smith to “hurry up you bitch” and demanded that she not look at him. Smith testified that after collecting money from the office, the man moved everyone into the break room and made them lie on the floor near Cardoso’s body. The man then exited through the store’s back emergency exit, which he previously had Smith unlock. After the man left, Soto and Church got up to seek help.
 

 Officer Richard L. McKee, of the City of St. Petersburg Police Department, testified that when he arrived at Big Lots at
 
 *149
 
 approximately 6:30 p.m. on December 24, 1997, he found a shooting victim lying face down in a break room and three other individuals who appeared to be in shock also lying face down in the room with their hands behind their heads.
 

 Dr. Noel Palma, Associate Medical Examiner for Pinellas and Pasco Counties, testified as an expert in forensic pathology on behalf of the State. He testified that the cause of Cardoso’s death was a gunshot wound to the trunk. He testified that there were abrasions and contusions on the victim’s right back, arm, and hand that appeared to have been inflicted shortly before or certainly within the same day as death. Dr. Palma explained that a bullet entered Cardoso’s left back and was recovered from the right lobe of his liver, indicating that the bullet had traveled left to right, back to front, and downward across the body. Dr. Palma opined that given the soot pattern on the victim’s shirt, the gun muzzle was less than a foot from the victim when fired.
 

 Smith testified that during the investigation of this crime, she identified the robber in a photopack shown to her by law enforcement officers. Although she could not previously identify the assailant, at trial Soto identified Peterson as the man she suspected of stealing from the Big Lots during operating hours on December 24, 1997, who she believed was the same man who later robbed the store because both men appeared to be wearing the same clothing that day. James Ronald Davis, who was a customer in Big Lots between 5:30 p.m. and 6 p.m. on December 24,1997, testified that while shopping he encountered a black male pacing in the back aisle of the store. Davis testified that he observed the man for about five minutes and described him as five feet nine inches or five feet ten inches tall with a medium build and thin mustache. Davis stated that when he went to the front of the store to pay for his items two or three minutes after the last checkout announcement, the man remained in the back of the store. Davis testified that although he did not think he could identify that man from the store at the time of trial, in 1998 he identified Peterson from a photopack as the man he saw lingering in the back of Big Lots at closing on December 24,1997.
 

 Several law enforcement personnel associated with the City of St. Petersburg Police Department testified about the search of two residences pursuant to search warrants. One residence was the home of Peterson’s father, and the other was the home of Peterson’s sister. Two pieces of grayish-black nylon stockings were seized from a dresser in a bedroom of his father’s house. Three latex gloves were seized from a kitchen drawer in his sister’s house. A gray nylon cap and a piece of nylon stocking were found in vehicles owned and operated by Peterson.
 

 Janet Staples Hillman Gosha, Peterson’s former girlfriend, testified that sometime between 1996 and September 1998, when looking for cleaning supplies, she found cash in bank wrappers in a box underneath the sink in their home. She testified that she saw money inside a safe at their residence that was not hers and that she once found a small, silver gun in a bedroom drawer with some of Peterson’s belongings. She stated that the gun did not belong to her or her adult son. She explained that while she drove one of Peterson’s vehicles when she lived with Peterson, she did not leave pantyhose in the car and that she did not recall Peterson wearing a wave cap or processing his hair in a manner that would require use of a wave cap.
 

 In addition, pursuant to
 
 Williams v. State,
 
 110 So.2d 654, 663 (Fla.1959), the State presented evidence that Peterson
 
 *150
 
 had robbed a Family Dollar, a Phar-Mor, and a McCrory’s in the greater Tampa/St. Petersburg area between February of 1997 and August 1998.
 

 Mary Palmisano, an employee who worked at a Family Dollar in Tampa, Florida, on February 14, 1997, testified that after she locked the doors that evening, she went into the store’s office and encountered a man with a gun. She stated that the man was black, about five feet eight inches or five feet ten inches tall and was wearing a mask that appeared to be made of thick stockings. Palmisano testified that the man asked for “big money,” referred to her and her female coworker as “bitches,” and repeatedly told them to not look at him. The man made her and her coworker lie face down on the floor and tied them up with cords from the office.
 

 In order to avoid admitting unfairly prejudicial evidence of a sexual battery, the trial court read a stipulation that DNA was recovered in the Family Dollar crime. Testing revealed that this DNA matched Peterson’s known DNA sample.
 

 Two employees of a St. Petersburg Phar-Mor testified about events in that store on May 12, 1998. Glendene Day testified that shortly after closing, she was confronted by a person in the storeroom who was not an employee. She described the person as a black male, about five feet six inches or five feet seven inches tall, medium build, wearing a mask, and carrying a gun. Day further described the mask as being made of black nylon that was “thin enough to see out of but thick enough that I couldn’t see in.” She stated that the man wore latex gloves, a black shirt, and tennis shoes. She explained that the man put the gun to her head, ordered her not to look at him, asked how many other employees were in the store, and told her she better not be lying. The man forced Day to call the other employees to the back room, where he ordered them to lie on the ground and used electrical tape, plastic strapping from boxes, and telephone cord to tie up two of the employees. Rather than bind Day, the man told her to walk him to where the money was kept. The man forced Day to unlock the office. He took manila envelopes from the office and directed Day to fill them with money. After gathering the money, she and the robber returned to the back room. The man made Day demonstrate that no alarm would sound when he opened the back exit and then bound Day with plastic strapping and telephone cord. The other employee to testify, Sirisone Vorasane, confirmed that after closing she was called to the warehouse, where she was confronted by an armed man who told her and her coworker to lie on the floor with their faces down and tied her hands and legs with plastic box ties. She described the man as “not that tall” with a petite build.
 

 A hair was found on a piece of electrical tape used to bind a Phar-Mor employee. Testing of the hair established that mitochondrial DNA extracted from the hair was consistent with Peterson’s known mitochondrial DNA profile. Shoe prints matching tennis shoes seized from a storage unit rented by Peterson were found in the Phar-Mor office. Gosha testified that in May 1998 she was asked by law enforcement officers to watch a surveillance video from the Phar-Mor robbery. At that time, she identified the person entering the store as Peterson. The surveillance tape was played for the jury, and Gosha again identified the person she saw in the tape as Peterson. Similarly, Ron T. Hill-man, Gosha’s brother, testified that he was previously asked by law enforcement officers to watch part of the Phar-Mor surveillance tape and that he identified the person he saw as Peterson. While on the
 
 *151
 
 stand, Hillman was shown the tape and again identified Peterson.
 

 Ann Weber, an employee who worked at a St. Petersburg McCrory’s on August 29, 1998, testified that just before 6 p.m., she went to the back of the store to have a cigarette and throw out the trash. When she walked through the dark stockroom, a man wearing a stocking over his face came out of the employee bathroom. Weber described the man as having “high, pudgy cheek bones.” She testified that the man held a small gun to her head and said, “Don’t fucking look at me or I’ll kill you.” Weber explained that the man asked her to deactivate the buzzer on the office door and then made her enter the office, crawl up the steps to where the money was kept so that no one in the store would see her, and open the safe. When Weber began to take the money out of the bags in which it was kept, the man said, “No, you stupid bitch.” Weber testified that the man asked her, “You close at six, right?” Upon being told that McCrory’s was open until 8 p.m., the man became “aggravated.” Weber testified that after collecting the money, the man took her to the employee bathroom, made her lie face down, and asked if there was any rope. He exited the store through the back door. Weber testified that she identified her assailant from a photopack during the investigation of the robbery and identified Peterson in the courtroom as the man who had robbed her. She explained that she was able to see his face through the stocking when she first encountered him because she was using a lighter to light her cigarette.
 

 A law enforcement officer testified that when searching the home of Peterson’s father, he found a green bank bag behind a refrigerator in the garage. Inside the bag, he found a white plastic McCrory’s bag; about thirty documents including checks, a bank deposit slip, charge card receipts with McCrory’s store number; an air freshener with a fifty-cent price tag; a McCrory’s receipt for fifty cents; a $20 bill; and what appeared to be a firearm but was actually a pellet gun. Weber identified the green bank bag as the one kept in the McCrory’s safe and all the recovered documents as things that would have been kept in the bag-except the McCrory’s receipt for fifty cents. A latent print examiner testified that a fingerprint and a palm print matching Peterson’s were found on a check and the receipt.
 

 On July 27, 2005, the jury found Peterson guilty of first-degree murder by general verdict. The trial court conducted a one-day penalty phase during which the State and the defense presented evidence.
 

 During the State’s presentation, the parties stipulated that Peterson had been convicted previously of thirteen felonies involving the use or threat of violence, including multiple convictions for robbery with a firearm, sexual battery, and false imprisonment, resulting in nine life sentences. The parties also stipulated that Peterson was on life parole from March 3, 1992, through October 20, 1998, which included December 24, 1997, the date of the homicide. The State then presented the testimony of one witness. Dale Smithson testified that he was on duty at a Jimmy Spur gas station in St. Petersburg, Florida, on April 30, 1981. Smithson explained that after locking the door at closing, he was confronted by a man with a gun who demanded money. The robber was later proven to be Peterson.
 

 The defense called two mental health professionals and three lay witnesses to testify. On direct examination, Michael Scott Maher, M.D., a physician and psychiatrist, testified that Peterson functioned at the level of a mid-teenager, fourteen to sixteen years of age. He opined that “Mr. Peterson does have some capacity to con
 
 *152
 
 form his behavior to the requirements of the law, but that capacity is less than an average adult, substantially less than an average adult.” Based on Peterson’s age and history of only minor infractions while in prison, Dr. Maher opined that Peterson is likely to be well-behaved in prison. On cross-examination, Dr. Maher testified that Peterson meets the criteria for antisocial personality disorder. He testified at length about the general characteristics of individuals with that disorder and whether Peterson displayed those characteristics. Dr. Valerie R. McClain, a forensic psychologist, testified that she performed IQ testing on Peterson and that his full-scale score on the Wechsler Adult Intelligent Scale was 77, placing him in the borderline range. On cross-examination, Dr. McClain testified that Peterson graduated from high school with a 2.0 grade point average.
 

 Linda Dyer, a classifications supervisor and custodian of records for the Pinellas County Sheriffs Office, testified that Peterson had received only one disciplinary report since he came into the custody of the Pinellas County Sheriff on January 19, 2001. She opined that one disciplinary report in that amount of time was a good record. Annie Peterson, Peterson’s mother, testified that she never heard of Peterson getting in trouble in school and that after graduation he joined the Army. She testified that while paroled, Peterson worked in food and beverage service at the Marriott Hotel for seven years, part of that time as a manager. Laquanda Monique Peterson, Peterson’s niece, testified that Peterson was like a father to her.
 

 On July 29, 2005, the jury recommended the death sentence by- an eight-to-four vote. After conducting a hearing pursuant to
 
 Spencer v. State,
 
 615 So.2d 688 (Fla.1993), and considering post-trial motions, the trial court followed the jury’s recommendation and sentenced Peterson to death. -
 
 State v. Peterson,
 
 No. CRC00-05107-CFANO-I (Fla. 6th Cir. order filed Jan. 6, 2006) (Sentencing Order). The trial court found and assigned weight to three aggravating factors,
 
 [1]
 
 one statutory mitigating factor,
 
 [2]
 
 and five nonstatutory factors.
 
 [3]
 

 Id.
 
 at 4-15.
 

 In this appeal, Peterson argues that (A) the trial court erred by admitting evidence of three collateral robberies; (B) death by lethal injection constitutes cruel and unusual punishment; (C) his death sentence is disproportionate; (D) the trial court erred in denying defense counsel’s motion for a new penalty phase due to the presentation of evidence and argument that Peterson lacked remorse; (E) Florida’s capital sentencing process is unconstitutional pursuant to
 
 Ring v. Arizona,
 
 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002); and (F) the penalty-phase jury instructions
 
 *153
 
 unconstitutionally shifted the burden of proof to the defendant. In addition to considering Peterson’s arguments on appeal, this Court reviews the record to confirm that sufficient evidence supports the jury’s verdict.
 
 See
 
 Fla. R.App. P. 9.142(a)(6).
 

 II. ANALYSIS
 

 A. Admission of Collateral Crime Evidence
 

 In
 
 Williams,
 
 this Court held that “evidence of any facts relevant to a material fact in issue except where the sole relevancy is character or propensity of the accused is admissible unless precluded by some specific exception or rule of exclusion.” 110 So.2d at 663. The rule has since been codified in section 90.404(2)(a), Florida Statutes (2005), which provides:
 

 Similar fact evidence ... is admissible when relevant to prove a material fact in issue, including, but not limited to, proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident, but it is inadmissible when the evidence is relevant solely to prove bad character or propensity.
 

 This Court has held that before admitting collateral crime evidence, the trial court must make four determinations: whether there is sufficient evidence that defendant committed the collateral crime; whether the collateral crime meets the similarity requirements necessary to be relevant; whether the collateral crime is too remote, so as to diminish its relevance; and whether the prejudicial effect of the collateral crime substantially outweighs its probative value.
 
 Robertson v. State,
 
 829 So.2d 901, 907-08 (Fla.2002). In
 
 McLean v. State,
 
 934 So.2d 1248, 1255 (Fla.2006), this Court explained the substantial similarity requirement, stating:
 

 [I]n cases where the purported relevancy of the collateral crime evidence is the identity of the defendant, we have required “identifiable points of similarity” between the collateral act and charged crime that “have some special character or [are] so unusual as to point to the defendant.”
 
 Drake v. State,
 
 400 So.2d 1217, 1219 (Fla.1981). This is because “[t]he mode of operating theory of proving identity is based on both the similarity of and the unusual nature of the factual situations being compared.”
 
 Id.
 
 Thus, “[a] mere general similarity will not render the similar facts legally relevant to show identity.”
 
 Id.
 

 The Court considers both similarities and dissimilarities between the collateral crimes and the charged offense when reviewing whether “a sufficiently unique pattern of criminal activity [justifies] admission.”
 
 Peek v. State,
 
 488 So.2d 52, 55 (Fla.1986) (quoting
 
 Chandler v. State,
 
 442 So.2d 171, 173 (Fla.1983)). A trial court’s determination that evidence is relevant and admissible “will not be disturbed absent an abuse of discretion.”
 
 Taylor v. State,
 
 855 So.2d 1, 21 (Fla.2003) (quoting
 
 Sexton v. State,
 
 697 So.2d 833, 837 (Fla.1997)).
 

 Peterson does not dispute that he committed the collateral robberies. His appellate counsel informed this Court that Peterson was either convicted or pled guilty to each collateral robbery. Instead, Peterson argues that the Family Dollar, Phar-Mor, and McCrory’s robberies were not sufficiently factually similar to the charged offense to be relevant and that the collateral crime evidence improperly became a feature of the trial. After reviewing the record, we find that the trial court did not abuse its discretion in allowing the collateral crime evidence.
 

 In
 
 Rogers v. State,
 
 511 So.2d 526 (Fla.1987), the defendant was charged with
 
 *154
 
 murdering a man as he exited a Winn-Dixie grocery store after attempting to rob the store. This Court found that evidence of two robberies committed subsequent to the charged homicide was admissible. The Court explained:
 

 The trial court, listing the following similarities, correctly deemed the collateral-crimes evidence a “close, well-connected chain of similar facts” between all the robberies:
 

 1) Target is a chain-type grocery store.
 

 2) Robbery takes place just prior to closing.
 

 3) Two white males involved, one slightly taller than the other. Both in the mid twenties or early thirties.
 

 4) Both wear nylon stocking masks.
 

 5) Each carries an automatic type firearm (handgun).
 

 6) One robber directs his attention to the cash registers, while the other seeks out the office and office safe area containing cash receipts.
 

 7) Both robbers direct patrons and employees to “lay on the floor.”
 

 8) Unnecessary violence and physical contact with victims is sought to be avoided.
 

 9) Bags are used to secure money, plastic or pillow cases.
 

 10) Tom McDermid was one of two participants.
 

 Id.
 
 at 531. Similarly, in
 
 Black v. State,
 
 630 So.2d 609, 618 (Fla. 1st DCA 1993), the First District Court of Appeal affirmed the admission of evidence of two collateral robberies because while none of the similarities between the crimes were sufficiently unique on their own, when considered “in conjunction” they did rise to the level of uniqueness required for admission. The First District found dispositive that in each crime
 

 large retail stores were robbed at the end of weekend business; store employees were confined, given similar instructions, and telephones were dismantled; the robber in each instance appeared to have some prior knowledge of the business premises and, the robber in each instance wore a ski mask, gloves, carried a large automatic pistol, and had the same physical characteristics.
 

 Id.
 
 at 618.
 

 Rogers
 
 and
 
 Black
 
 refute Peterson’s claim that the cumulative pattern of crimes in his case was insufficient to establish relevance. The four crimes in
 
 Peterson
 
 all involved characteristics similar to and as numerous as those found in
 
 Rogers
 
 and
 
 Black:
 
 (1) all robberies took place in discount stores; (2) all robberies took place just after closing (or when the perpetrator believed store was about to close); (3) the perpetrator hid in a nonpublic area of the store and waited for an employee to come to him; (4) the perpetrator was a black male of slight to medium build; (5) the perpetrator wore a nylon stocking mask covering his whole face; (6) the perpetrator carried a small firearm which he held to employees’ heads; (7) the perpetrator used an employee to obtain cash from the store’s office; (8) the perpetrator used materials from the store to secure the stolen money; (9) the perpetrator directed employees to lie on the floor; (10) the perpetrator directed employees to not look at him; (11) the perpetrator referred to store employees as “bitches”; and (12) the perpetrator exited through the store’s back exit. When the circumstances of the crimes are considered cumulatively, “identifiable points of similarity ... pervade the compared factual situations” and point to the defendant.
 
 Drake,
 
 400 So.2d at 1219.
 

 In addition, the Court in
 
 Rogers
 
 did not find the dissimilarity of a murder occurring in one attempted robbery where
 
 *155
 
 violence had been avoided in the other robberies to render the collateral crime evidence irrelevant. Thus, Peterson’s argument that the sexual batteries during the Family Dollar robbery and the homicide during the Big Lots robbery render the collateral crime evidence irrelevant is unpersuasive. The sexual batteries and homicide are material differences between the crimes that must be considered in evaluating the admissibility of the collateral crime evidence. However, the trial court did not abuse its discretion because the substantial similarities among the crimes greatly outweighed the dissimilarities.
 

 We also conclude that the trial court did not abuse its discretion by allowing the collateral crime evidence to become a feature of the trial. In
 
 Conde v. State,
 
 860 So.2d 930 (Fla.2003), this Court explained that relevant evidence of collateral crimes impermissibly becomes a feature of the trial when the evidence “ ‘transcendfs] the bounds of relevancy to the charge being tried’ and the prosecution ‘devolves from development of facts pertinent to the main issue of guilt or innocence into an assault on the character of the defendant.’ ”
 
 Id.
 
 at 945 (quoting
 
 Williams v. State,
 
 117 So.2d 473, 475 (Fla.1960)). The Court found that it is “not solely the quantity but also the quality and nature of collateral crimes evidence in relation to the issues to be proven” that determines whether it became a feature of the trial.
 
 Id.
 
 at 946. The quality at issue is the relevancy of the evidence, not whether it is physical evidence or testimony. The Court noted that it had previously affirmed the admission of extensive collateral crime evidence where that evidence was wholly probative of material issues,
 
 see, e.g., Wuornos v. State,
 
 644 So.2d 1000, 1006-07 (Fla.1994) (affirming admission of evidence of six collateral murders), and that where the Court had reversed the admission of extensive collateral crime evidence, it did so because the evidence lacked relevance.
 
 See, e.g., Steverson v. State,
 
 695 So.2d 687, 690-91 (Fla.1997) (holding admission of evidence of resisting arrest was reversible error because “blow-by-blow” account of law enforcement officer’s injuries and recovery was irrelevant to charged offense);
 
 Billie v. State,
 
 863 So.2d 323, 329 (Fla. 3d DCA 2003) (finding evidence of irrelevant prior “bad acts” impermissibly became feature of trial).
 

 More specifically in
 
 Conde,
 
 the Court found no error where the trial court allowed evidence concerning five collateral murders presented over the course of three days in the prosecution of a sixth murder. The Court explained that “the length of this testimony was unavoidable given the fact that five collateral crimes were involved.” 860 So.2d at 946-47. The Court further explained:
 

 Additionally, the record reflects that the State limited its evidence regarding the five prior murders: a single medical examiner was called to summarize from the records of numerous other examiners the cause-of-death evidence for all five murders; only one serologist, one DNA criminologist, and one trace-evidence specialist gave summary testimony regarding the DNA and fiber evidence linking the collateral crimes; and the State rapidly introduced collateral crime-scene testimony from .eight detectives, including cross-examination, over the course of only six hours. As for photographs, the State introduced approximately five for each collateral murder, each of which had a specific purpose of establishing the similarity between the crimes. Given the trial court’s vigilance in its duty to ensure that the collateral crimes evidence did not become a feature of the trial, we find that no abuse of discretion occurred in the ad
 
 *156
 
 mission of this evidence. In so concluding, we place special emphasis on the fact that the trial court repeatedly instructed the jury as to the proper purpose of this
 
 Williams
 
 rule evidence each time it was introduced.
 

 Id.
 
 at 947 (footnote omitted). Similarly, in
 
 Wuornos,
 
 644 So.2d at 1006 (quoting
 
 United States v. Beechum,
 
 582 F.2d 898 (5th Cir.1978)), the Court found that evidence about six collateral murders was not needless “overkill” where the evidence was relevant to refuting Wuornos’s claim of self-defense.
 

 In this case, the trial court did not err in allowing evidence of the three collateral robberies to be presented because, as discussed above, all of the collateral robberies were sufficiently similar to the charged crime to be probative of identity, which rendered the evidence relevant and admissible. Moreover, as in
 
 Conde,
 
 the State limited its presentation of collateral crime evidence. Many of the collateral crime witnesses testified briefly, and much of the testimony was unavoidable due to the number of robberies involved. The State limited the emotional impact of its presentation by having only four victims testify and cooperated with the trial court and the defense to ensure that unduly prejudicial evidence was not admitted. Importantly, none of the evidence in
 
 Peterson
 
 was offered merely to demonstrate Peterson’s criminal propensity — all of the evidence was directed at proving he committed the collateral crimes and that the crimes were similar to the charged offense. The collateral crime evidence in this case was not like the testimony about child abuse that was found to be more unfairly prejudicial than probative in
 
 Sexton v. State,
 
 697 So.2d 833, 837 (Fla.1997), where the testimony “had no bearing upon Sexton’s treatment of’ the child he forced to commit the murder and “Sexton was not on trial for the maltreatment of his children.”
 

 Also as in
 
 Conde,
 
 the trial court was “vigilan[t] in its duty to ensure that the collateral crimes evidence did not become a feature of the trial.” 860 So.2d at 947. The trial court scrupulously instructed the jury on the proper use of
 
 Williams
 
 rule evidence before each collateral crime witness and as an additional precaution gave a “hybrid”
 
 Williams
 
 rule instruction before each witness that would be testifying about both the charged offense and the collateral crimes.
 

 In conclusion, we agree with the finding of the Fourth District Court of Appeal in
 
 Townsend v. State,
 
 420 So.2d 615 (Fla. 4th DCA 1982), that collateral crime evidence does not become the impermissible feature of the trial simply because it is voluminous. The trial court did not abuse its discretion by allowing the collateral crime evidence because it was probative of material issues and its probative value was not substantially outweighed by the danger of unfair prejudice.
 

 B. Lethal Injection
 

 Peterson argues that Florida’s lethal injection process is unconstitutional because it employs a three-drug protocol that may cause undue pain and because it does not require trained medical personnel to participate in the execution. These arguments have been rejected previously by this Court.
 
 See Lightbourne v. McCollum,
 
 969 So.2d 326, 350 n. 22 (Fla.2007) (rejecting arguments about whether execution team members are “adequately experienced” and “medically qualified” and whether pancuronium bromide should be part of protocol because it is used for “purely cosmetic reasons”);
 
 see also Schwab v. State,
 
 969 So.2d 318, 324-25 (Fla.2007) (affirming summary denial of claim challenging three-drug protocol because Schwab did not allege existence of any new evidence about the chemicals not
 
 *157
 
 considered in
 
 Lightbourne
 
 or
 
 Sims v. State,
 
 754 So.2d 657, 668 (Fla.2000)). Peterson does not point to any new evidence supporting these arguments. Furthermore, this Court has held that the Supreme Court’s decision in
 
 Baze v. Rees,
 
 — U.S.-, 128 S.Ct. 1520, 170 L.Ed.2d 420 (2008), does not require reconsideration of
 
 Lightboume
 
 and
 
 Schwab. See Henyard v. State,
 
 992 So.2d 120, 129 (Fla.),
 
 cert. denied,
 
 — U.S. -, 129 S.Ct. 28, 171 L.Ed.2d 930 (2008). Thus, Peterson’s claim is without merit.
 
 See Tompkins v. State,
 
 994 So.2d 1072 (Fla.2008) (listing cases where Court has rejected lethal injection claims that do not raise new issues).
 

 C. Proportionality
 

 To ensure uniformity of sentencing in death penalty proceedings, this Court considers the totality of circumstances and compares each case with other capital cases. The Court does not simply compare the number of aggravating and mitigating circumstances.
 
 Taylor v. State,
 
 937 So.2d 590, 601 (Fla.2006). Peterson argues that this Court’s decision to reverse the death sentence in
 
 Terry v. State,
 
 668 So.2d 954 (Fla.1996), demonstrates that his death sentence is likewise disproportionate. This argument is without merit.
 

 In
 
 Terry,
 
 the defendant was convicted of shooting a customer during a convenience store robbery. Despite the trial court finding no mitigation, the Court found the death sentence disproportionate because there was comparatively weak aggravation:
 

 The first aggravator (a capital felony committed during the course of an armed robbery/pecuniary gain) is based on the armed robbery being committed by appellant when the killing occurred. The second aggravator, prior violent felony, does not represent an actual violent felony previously committed by Terry, but, rather, a contemporaneous conviction as principal to the aggravated assault simultaneously committed by the codefendant Floyd who pointed an inoperable gun at Mr. Franco. While this contemporaneous conviction qualifies as a prior violent felony and a separate aggravator, we cannot ignore the fact that it occurred at the same time, was committed by a codefendant, and involved the threat of violence with an inoperable gun. This contrasts with the facts of many other cases where the defendant himself actually committed a prior violent felony such as homicide.
 

 Id.
 
 at 965-66. The aggravating circumstances in the instant case are weightier than those found in
 
 Terry.
 
 The robbery aggravator was based on similar facts, but unlike Terry, Peterson has been convicted of thirteen other violent felonies and was on life parole at the time of the murder.
 
 Peterson
 
 is a case “where the defendant himself actually committed a prior violent felony.”
 
 Terry,
 
 668 So.2d at 966.
 

 Moreover, the facts of this case are comparable to other murders during robberies where this Court has found the death sentence to be proportionate. For example, in
 
 Blake v. State,
 
 972 So.2d 839, 842 (Fla.2007), this Court found the death sentence to be proportionate where the defendant confessed to law enforcement officers that he shot the owner and operator of a convenience store after entering the store to rob it. The trial court found three aggravating factors: previous conviction of another capital felony; that the defendant was under sentence of imprisonment; and that the defendant was engaged in an attempt to commit the crime of armed robbery. The Court distinguished
 
 Blake
 
 from
 
 Terry
 
 because the prior violent felony aggravating factor was based on a murder during a separate robbery, not a contem
 
 *158
 
 poraneous conviction.
 
 Blake,
 
 972 So.2d at 848-49.
 

 Similarly, in
 
 Mendoza v. State,
 
 700 So.2d 670, 679 (Fla.1997), this Court held that the death penalty was proportionate for a murder during a robbery where the prior violent felony aggravating circumstance was based on an entirely separate armed robbery conviction, not a contemporaneous conviction. Notably, the only aggravating circumstances in
 
 Mendoza
 
 were previous conviction of a violent felony and that the murder was committed during the commission of a robbery, merged with the fact that it was committed for pecuniary gain. Unlike Peterson, Mendoza was not found to be under sentence of imprisonment at the time of the murder.
 

 Peterson argues that he should receive a life sentence due to the mitigation found in his case, but, again, we find
 
 Blake
 
 analogous. In that case, the trial court found one statutory mitigating factor — age at the time of the offense — and seven nonstatuto-ry mitigating factors: appropriate courtroom behavior; loving, nonviolent relationship with his family; remorse; cooperation with law enforcement officers; copartici-pant sentenced to life imprisonment; only one prior violent felony conviction; and good adjustment to confinement. This Court affirmed the imposition of the death sentence in
 
 Blake.
 
 Peterson’s limited mental impairment, consisting of a low to normal IQ and some difficulty in school, is the only type of mitigation present in
 
 Peterson
 
 that was not present in
 
 Blake.
 
 This mitigation is not sufficiently weighty to compel a life sentence in
 
 Peterson.
 
 Overall, given the factual similarities to
 
 Blake
 
 and
 
 Mendoza,
 
 we find the death sentence is proportionate in this case.
 

 D. Evidence and Argument about Lack of Remorse
 

 Peterson argues that the trial court erred by allowing the State to introduce evidence indicating that Peterson lacked remorse and by allowing the State to argue lack of remorse during closing arguments. “The admissibility of evidence is within the sound discretion of the trial court, and the trial court’s determination will not be disturbed on appellate review absent a clear abuse of that discretion.”
 
 Brooks v. State,
 
 918 So.2d 181, 188 (Fla.2005). Likewise, appellate courts apply an abuse-of-discretion standard when considering whether a trial court erred in overruling objections to comments made during closing arguments.
 
 McArthur v. State,
 
 801 So.2d 1037, 1040 (Fla. 5th DCA 2001) (citing
 
 Moore v. State,
 
 701 So.2d 545 (Fla.1997)).
 

 This Court’s precedent prohibits presenting evidence about lack of remorse in support of an aggravating factor. “[Tjhis Court held that ‘lack of remorse is not an aggravating factor’ and that ‘lack of remorse should have no place in the consideration of aggravating factors.’ ”
 
 Tanzi v. State,
 
 964 So.2d 106, 114-15 (Fla.2007) (quoting
 
 Pope v. State,
 
 441 So.2d 1073, 1078 (Fla.1983)),
 
 cert. denied,
 
 — U.S. -, 128 S.Ct. 1243, 170 L.Ed.2d 86 (2008). This Court has further held that the State ordinarily may not present evidence or argument about a defendant’s lack of remorse in the context of discussing a diagnosis of antisocial personality disorder. For example, in
 
 Atwater v. State,
 
 626 So.2d 1325, 1328 (Fla.1993), the Court held that the trial court erred in permitting the State to ask on cross-examination whether persons with antisocial personality disorder showed remorse.
 
 See also Robinson v. State,
 
 520 So.2d 1, 5-6 (Fla.1988). This Court has further held that the State may not circumvent the prohibition against lack-of-remorse evidence by using synonymous words and phrases.
 
 See, e.g., Sireci v. State,
 
 587 So.2d 450, 454 (Fla.1991) (holding that trial
 
 *159
 
 court erred in allowing State witness to testify that “after Sireci read about the murder in the newspaper, ‘he seemed rather proud of it.’ ”).
 
 [4]
 

 Peterson argues that the State’s cross-examination of expert witness Dr. Maher about lack of empathy and contemptuousness as symptoms of antisocial personality disorder was tantamount to questioning and argument about lack of remorse. The State contends that the questioning about Peterson’s lack of empathy and contempt for his victims was not improper because empathy refers to the defendant’s mental and emotional state at the time of the crime whereas remorse refers to the defendant’s mental and emotional state after the crime. We agree that this is a relevant distinction. Florida’s statutory aggravating and mitigating factors recognize the defendant’s mental and emotional state at the time of the crime as factors relevant to sentencing.
 
 See
 
 § 921.141(5)-(6), Fla. Stat. (2008). The majority of the State’s questioning of Dr. Maher properly focused on Peterson’s state of mind at the time of the offense as it related to the proposed statutory mitigating factor of substantially impaired capacity to appreciate the criminality of his conduct.
 
 [5]
 

 A few of the State’s questions did solicit testimony about Peterson’s after-the-fact feelings towards the victims of his crimes. While these questions arguably solicited testimony about remorse without using the term “remorse,” any error was harmless beyond a reasonable doubt.
 
 See Franklin v. State,
 
 965 So.2d 79, 95 (Fla.2007) (applying harmless error analysis to erroneously admitted evidence). We find that the brief references to Peterson’s refusal to acknowledge his wrongdoing did not influence the jury’s recommendation or the trial court’s sentencing decision. The State’s closing argument was proper, and there was significant, undisputed aggravation and relatively weak mitigation — specifically Peterson had been convicted of thirteen prior felonies and was on probation at the time of the murder compared to no evidence of major mental illness or other compelling mitigating circumstances.
 
 [6]
 
 
 *160
 
 Moreover, while the trial court considered the proper portions of Dr. Maher’s testimony as it related to Peterson’s state of mind at the time of the crime, it did not rely on the arguably improper evidence or argument in reaching its decision to impose the death penalty. Based on the foregoing, Peterson is not entitled to a new penalty phase.
 
 See Randolph v. State,
 
 562 So.2d 331, 338 (Fla.1990) (holding one improper question about lack of remorse harmless beyond reasonable doubt in light of totality of evidence);
 
 Atwater,
 
 626 So.2d at 1328 (holding cross-examination of expert witness about whether persons with antisocial personality disorder show remorse was harmless error).
 

 E.
 
 Ring
 
 Claims
 

 Peterson argues that Florida’s capital sentencing scheme is unconstitutional under
 
 Ring v. Arizona,
 
 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002). This Court has repeatedly held that where a death sentence is supported by the prior violent felony aggravating factor, as is the case here, Florida’s capital sentencing scheme does not violate
 
 Ring. See, e.g., Frances v. State,
 
 970 So.2d 806, 822 (Fla.2007), ce
 
 rt. denied,
 
 — U.S. -, 128 S.Ct. 2441, 171 L.Ed.2d 241 (2008);
 
 Lebron v. State,
 
 982 So.2d 649 (Fla.2008). This Court has found that
 
 “Ring
 
 did not alter the express exemption in
 
 Apprendi v. New Jersey,
 
 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), that prior convictions are exempt from the Sixth Amendment requirements announced in the cases.”
 
 Frances,
 
 970 So.2d at 822;
 
 see also Johnston v. State,
 
 863 So.2d 271, 286 (Fla.2003) (“[The] prior violent felony conviction alone satisfies constitutional mandates because the conviction was heard by a jury and determined beyond a reasonable doubt.”).
 

 Peterson’s argument that this Court has erred in unanimously finding
 
 Ring
 
 inapplicable where the prior violent felony aggravating factor is present is procedurally barred because Peterson did not raise that argument to the trial court. The argument is also without merit. Peterson argues that since, as held in
 
 Cox v. State,
 
 819 So.2d 705 (Fla.2002), evidence may be admitted during the penalty phase to show more than the mere fact of a prior conviction, not requiring a unanimous jury finding that the aggravator was proven violates
 
 Ring.
 
 We disagree. Because the operative jury where the prior violent felony aggravating factor is present is the jury that convicted the defendant of the prior felony, not the sentencing jury, it is irrelevant for constitutional purposes that the sentencing jury may hear evidence beyond that required to prove the fact of conviction.
 

 F. Penalty-Phase Jury Instructions
 

 Peterson claims that the standard penalty-phase jury instructions given in his case unconstitutionally shifted the burden of proof to him to establish mitigating circumstances and to show that those factors outweighed the aggravating circumstances. His arguments are without merit. Similar arguments have been rejected previously by this Court.
 
 See, e.g., Johnson v. State,
 
 969 So.2d 938, 961-62 (Fla.2007) (rejecting arguments that standard instructions unconstitutionally place burden of proof on defendant to prove death sentence is inappropriate and that instructions improperly restrict evidence that jury may consider in mitigation).
 

 
 *161
 
 G. Sufficiency of Evidence
 

 Peterson does not contest the sufficiency of the evidence, but in death penalty appeals, this Court independently reviews the record to confirm that the jury’s verdict is supported by competent, substantial evidence.
 
 See
 
 Fla. R.App. P. 9.142(a)(6). In this ease, the State argued that both felony murder and premeditated murder theories were applicable to the crime, and the jury delivered a general verdict. “A general guilty verdict rendered by a jury instructed on both first-degree murder alternatives may be upheld on appeal where the evidence is sufficient to establish either felony murder or premeditation.”
 
 Crain v. State,
 
 894 So.2d 59, 73 (Fla.2004).
 

 While we find insufficient evidence of premeditation in this case, the first-degree murder conviction is supported by competent, substantial evidence of felony murder. The State proved beyond a reasonable doubt that a robbery occurred at the Big Lots store on December 24, 1997, and that John Cardoso was killed during that robbery. Karen Smith testified that a masked, gloved man forced her at gunpoint to collect money from the store and to give the money to him. Maria Soto testified that an armed man threatened “to kill us, to do to us what he had done to ... John.” The State and defense stipulated that the body found in the Big Lots store after the robbery was John Cardoso and that Cardoso was dead. No witness testified that more than one person committed the robbery. The State also proved that Peterson was the man who robbed the store. In addition to the collateral crime evidence circumstantially connecting Peterson to the Big Lots robbery, as summarized above, the State presented several witnesses who identified Peterson as the robber. This evidence is sufficient to support the conviction under a felony murder theory.
 
 See, e.g., Blake,
 
 972 So.2d at 850 (holding evidence supported first-degree felony murder conviction where Blake admitted entering store with handgun to commit robbery and to shooting victim).
 

 III. CONCLUSION
 

 Based on the foregoing, we affirm Peterson’s conviction for first-degree murder and his sentence of death.
 

 It is so ordered.
 

 QUINCE, C.J., WELLS, PARIENTE, LEWIS, CANADY, and POLSTON, JJ„ and ANSTEAD, Senior Justice, concur.
 

 [1]
 

 . The aggravating factors were: (1) Peterson was under a sentence of imprisonment at the time of the murder — life parole for three 1981 robberies (ássigned great weight); (2) Peterson was previously convicted of a violent felony, based on thirteen convictions, resulting in a total of nine life sentences (assigned great weight); and (3) Peterson committed the murder during the commission of a robbery (assigned significant weight).
 

 [2]
 

 . The trial court found the age statutory mitigating factor, despite Peterson’s age of thirty-eight at the time of the offense, based on expert testimony that he functioned at the emotional level of a fourteen- to sixteen-year-old. This factor was given little weight.
 

 [3]
 

 .The nonstatutory mitigating factors were: (1) Peterson had a low to normal IQ (assigned little weight); (2) Peterson had some limited mental impairment (assigned little weight); (3) Peterson had a good relationship with at least two family members (assigned some weight); (4) Peterson had a consistent work history (assigned some weight); and (5) Peterson had an exemplary disciplinary record in jail and likely will behave properly when placed in prison (assigned little weight).
 

 [4]
 

 . The Court has recognized an exception to the prohibition against presenting evidence of lack of remorse. The Court held that evidence about lack of remorse may be used to rebut the proposed mitigating factors of remorse for the crime or rehabilitation.
 
 See Singleton v. State,
 
 783 So.2d 970, 978 (Fla.2001). This exception is not applicable in this case. While Dr. Maher testified that due to Peterson's age, he expected that in prison Peterson would "tend to be less impulsive, less aggressive, less violent,” the defense did not propose rehabilitation as a mitigating factor.
 

 [5]
 

 . Peterson also challenges the State's closing argument based on Dr. Maher's testimony. After reviewing the record, we find that the prosecutor's closing argument did not discuss Peterson's state of mind after the crime. The prosecutor properly focused his argument on the proposed mitigating factors and did not discuss whether Peterson felt remorse or the equivalent thereof after the murder. Because we find that the State’s closing argument was proper, there is no need to address whether this issue was preserved for review.
 

 [6]
 

 .Peterson argues that a
 
 St. Petersburg Times
 
 article demonstrates that the jury considered lack of remorse in reaching its recommendation. The article states that the jury forewoman stated that she wondered if there would have been another result had Peterson taken the stand and said he was sorry. This Court has held that a juror's consideration of a defendant’s decision not to testify is a matter that inheres in the verdict.
 
 Sims v. State,
 
 444 So.2d 922, 925 (Fla.1983). In
 
 Devoney v. State, 111
 
 So.2d 501, 504-05 (Fla.1998), the Court found that a juror’s allegation that one or more jurors deliberated about a matter they were told to disregard was a matter inhering in the verdict. As a result, the majority of the Court held that the trial court erred in granting a new trial based on the juiy's improper deliberation. Under
 
 Devoney,
 
 this Court may not consider the alleged com
 
 *160
 
 ments by the jury forewoman in deciding whether Peterson was entitled to a new penalty phase.