# Supreme Court of Florida

_____

No. SC12-1442
_____

**CHARLES C. PETERSON,**
Appellant,

vs.

**STATE OF FLORIDA,**
Appellee.

_____

No. SC13-47
_____

**CHARLES C. PETERSON,**
Petitioner,

vs.

**MICHAEL D. CREWS, etc.,**
Respondent.

[June 26, 2014]

PER CURIAM.

Charles C. Peterson appeals an order of the circuit court denying his motion

to vacate his conviction of first-degree murder and sentence of death filed under

Florida Rule of Criminal Procedure 3.851 and petitions this Court for a writ of

habeas corpus. We have jurisdiction. See art. V, § 3(b)(1), (9), Fla. Const.

## BACKGROUND

### Trial

Peterson was convicted and sentenced to death for the murder of John

Cardoso. Peterson v. State, 2 So. 3d 146 (Fla. 2009). On direct appeal, we set

forth the relevant factual and procedural background as follows:

> Karen Smith testified that she worked as an assistant manager at a Big Lots in St. Petersburg, Florida, on the evening of December 24, 1997. She testified that while she and two other employees were in the store's office after the store closed at 6 p.m., she heard a "ruckus." She explained that when she opened the locked office door, she was immediately confronted by a man pointing a gun at her . . . . He wore a "nylon scarf" over his face and off-white latex gloves. Soto described the man as black, between five feet six inches and five feet eight inches tall, and noted that he wore latex gloves.
>     [Ms. Smith and Maria Soto] testified that the man escorted the three employees from the office through the employee break room into the stockroom. The man held the gun to Smith's head as they walked. Smith testified that John Cardoso, another employee, was lying on the floor of the break room when they entered. Soto testified that the man forced her and the other employees to step over Cardoso . . . . Smith testified that after collecting money from the office, the man moved everyone into the break room and made them lie on the floor near Cardoso's body. The man then exited through the store's back emergency exit, which he previously had Smith unlock. After the man left, Soto and [Wanda] Church got up to seek help.
>     Officer Richard L. McKee, of the City of St. Petersburg Police Department, testified that when he arrived at Big Lots at approximately 6:30 p.m. on December 24, 1997, he found a shooting victim lying face down in a break room and three other individuals who appeared to be in shock also lying face down in the room with their hands behind their heads.

<u>Id.</u> at 148-49.

On July 27, 2005, the jury found Peterson guilty of first-degree murder by general verdict. The trial court conducted a one-day penalty phase during which the State and the defense presented evidence.

<u>Id.</u> at 151.

On July 29, 2005, the jury recommended the death sentence by an eight-to-four vote. After conducting a hearing pursuant to <u>Spencer v. State</u>, 615 So. 2d 688 (Fla. 1993) . . . the trial court followed the jury's recommendation and sentenced Peterson to death.

<u>Id.</u> at 152 (citation omitted). The trial court found and assigned weight to the following aggravation:

(1) Peterson was under a sentence of imprisonment at the time of the murder—life parole for three 1981 robberies (assigned great weight); (2) Peterson was previously convicted of a violent felony, based on thirteen convictions, resulting in a total of nine life sentences (assigned great weight); and (3) Peterson committed the murder during the commission of a robbery (assigned significant weight).

<u>Id.</u>

The trial court found the age statutory mitigating factor, despite Peterson's age of thirty-eight at the time of the offense, based on expert testimony that he functioned at the emotional level of a fourteen-to sixteen-year-old. This factor was given little weight.

<u>Id.</u>

The nonstatutory mitigating factors were: (1) Peterson had a low to normal IQ (assigned little weight); (2) Peterson had some limited mental impairment (assigned little weight); (3) Peterson had a good relationship with at least two family members (assigned some weight); (4) Peterson had a consistent work history (assigned some

weight); and (5) Peterson had an exemplary disciplinary record in jail and likely will behave properly when placed in prison (assigned little weight).

Id.

**Direct Appeal**

On direct appeal, Peterson raised six issues:

(A) the trial court erred by admitting evidence of three collateral robberies; (B) death by lethal injection constitutes cruel and unusual punishment; (C) his death sentence is disproportionate; (D) the trial court erred in denying defense counsel's motion for a new penalty phase due to the presentation of evidence and argument that Peterson lacked remorse; (E) Florida's capital sentencing process is unconstitutional pursuant to Ring v. Arizona, 536 U.S. 584, 122 S. Ct. 2428, 153 L. Ed. 2d 556 (2002); and (F) the penalty-phase jury instructions unconstitutionally shifted the burden of proof to the defendant.

Peterson, 2 So. 3d at 152-53.  In addition, this Court reviewed the sufficiency of

the evidence to support the conviction.  Id. at 153.  We affirmed Peterson's

conviction of first-degree murder and his death sentence.  Id.

**Postconviction Motion for Relief**

On or about September 21, 2010, Peterson filed a postconviction motion in

the circuit court, raising four claims: (1) trial counsel was ineffective for failing to

strike five biased jurors either for cause or by exercising a peremptory challenge,

thus violating Peterson's rights under the Fifth, Sixth, Eighth, and Fourteenth

Amendments to the United States Constitution and equivalent provisions of the

Florida Constitution; (2) trial counsel was ineffective for failing to object to

- 4 -

improper comments, arguments and other conduct of the State and request curative instructions and mistrial, and for failing to investigate exculpatory evidence, thus violating Peterson's constitutional rights; (3) trial counsel was ineffective during the penalty phase for failing to object to or limit testimony and evidence, thus violating Peterson's constitutional rights; and (4) the effect of cumulative errors denied Peterson his constitutional rights. After an evidentiary hearing on the three substantive claims of the four raised, held on December 12, 13, and 14, 2011, the postconviction court denied relief.

Peterson now appeals, claiming that the postconviction court erred by denying Peterson's claim that his trial counsel was ineffective for: (1) failure to strike five biased jurors either for cause or by exercising peremptory challenges; (2) failure to object to improper comments, arguments and other conduct of the State and request curative instructions and mistrial, and for failing to investigate affirmative evidence of innocence; (3) failure to present available mitigation evidence during the penalty phase; and (4) by denying relief based on the cumulative effect of counsel's errors. Peterson also petitions this Court for a writ of habeas corpus, claiming ineffective assistance of appellate counsel.

## ANALYSIS

Any claim that defense counsel provided ineffective assistance at trial must be analyzed under the standard articulated in Strickland v. Washington, 466 U.S. 668 (1984). See Carratelli v. State, 961 So. 2d 312, 321 (Fla. 2007).

First, counsel's performance must be shown to be deficient, meaning "counsel's performance fell below the standard guaranteed by the Sixth Amendment." McCoy v. State, 113 So. 3d 701, 707 (Fla. 2013). The defendant must point to "particular acts or omissions of the lawyer that are shown to be outside the broad range of reasonably competent performance under prevailing professional standards." Bolin v. State, 41 So. 3d 151, 155 (Fla. 2010). "[S]trategic decisions do not constitute ineffective assistance of counsel if alternative courses have been considered and rejected and counsel's decision was reasonable under the norms of professional conduct." Burns v. State, 944 So. 2d 234, 239 (Fla. 2006). "The defendant bears the burden to overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." McCoy, 113 So. 3d at 707 (quoting Strickland, 466 U.S. at 689). However, there is a strong presumption that counsel's performance was not deficient, and great deference is given to counsel's performance. Johnston v. State, 63 So. 3d 730, 737 (Fla. 2011). Moreover, counsel cannot be deemed ineffective for failing to make a meritless argument. See Lukehart v. State, 70 So. 3d 503, 513 (Fla. 2011).

Second, "the deficient performance must have prejudiced the defendant, ultimately depriving the defendant of a fair trial with a reliable result." McCoy, 113 So. 3d at 708. "[A] defendant need not show that counsel's deficient conduct more likely than not altered the outcome in the case." Strickland, 466 U.S. at 693. Rather, he "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. at 694; see also Bolin, 41 So. 3d at 155.

Additionally, both deficient performance and prejudice must be shown. McCoy, 113 So. 3d at 708. Therefore, "when a defendant fails to make a showing as to one element, it is not necessary to delve into whether he has made a showing as to the other element." Thompson v. State, 796 So. 2d 511, 516 (Fla. 2001). "Because both prongs of the Strickland test present mixed questions of law and fact, this Court employs a mixed standard of review, deferring to the circuit court's factual findings that are supported by competent, substantial evidence, but reviewing the circuit court's legal conclusions de novo." McCoy, 113 So. 3d at 708.

Peterson initially raises four general issues, which are comprised of eighteen subclaims. Because we find that the following claims are without merit, we affirm the postconviction court's denial of these claims without further discussion: (1)

II.A (failure to object during voir dire); (2) II.B (failure to file motion in limine and object during State's case-in-chief); (3) II.C.1 (State's mischaracterization of evidence during closing arguments); (4) II.C.2 (inadequately cross-examining M.P., witness of the Hillsborough County Family Dollar collateral crimes); (5) II.C.3 (failure to impeach Detective Jerry Herren); (6) II.C.4 (failure to make an opening statement); (7) II.C.5 (failure to address State's failure to prove collateral crimes beyond a reasonable doubt); (8) II.D (failure to challenge <u>Williams</u> rule evidence based on <u>Apprendi</u>); (9) II.E (inadequate handling of sexual battery evidence from Family Dollar collateral case); (10) II.F (failure to object to and challenge fingerprint evidence); (11) II.H (admission of <u>Williams</u> rule evidence violated Peterson's rights to due process, confrontation, and effective assistance of counsel); (12) III.A (failure to object to State's use of <u>Williams</u> rule cases as aggravation); (13) III.B (failure to object to State arguing facts not in evidence); (14) III.C (presenting only two lay witnesses as mitigation); and (15) III.D (failure to rely on Peterson's intellectual impairment and failing to mitigate State's branding of Peterson with antisocial personality stigma). <u>See</u> <u>Lukehart</u>, 70 So. 3d at 513; <u>see also</u> <u>Schoenwetter v. State</u>, 46 So. 3d 535, 546 (Fla. 2010) ("Where this Court has previously rejected a substantive claim on the merits, counsel cannot be deemed ineffective for failing to make a meritless argument.").

We now turn to the discussion of Peterson's remaining claims.

## A. Biased Jurors

### 1. Failure to Challenge Jurors for Cause

Peterson first claims that trial counsel should have challenged jurors

Aundrea Johnson, Marilyn Breen, Thomas Walbolt, Necole Tunsil, and Christine

Salgado for cause on grounds of juror incompetency. "[W]here a postconviction

motion alleges that trial counsel was ineffective for failing to raise or preserve a

cause challenge, the defendant must demonstrate that a juror was actually biased."

Carratelli, 961 So. 2d at 324. The actual bias standard requires a showing that the

questionable juror was not impartial, that is, "was biased against the defendant, and

the evidence of bias must be plain on the face of the record." Id. (citing Patton v.

Yount, 467 U.S. 1025, 1038-40 (1984)). In other words, the test for juror

competency is whether a juror "can lay aside any bias or prejudice and render [his

or her] verdict solely upon the evidence presented and the instructions on the law

given to [him or her] by the court." Id. (quoting Lusk v. State, 446 So. 2d 1038,

1041 (Fla. 1984)).

For each of the challenged jurors, Peterson has failed to allege actual bias.

See id. Furthermore, our review of the record does not uncover any indication that

a biased juror sat on Peterson's jury. Because Peterson has not demonstrated

actual bias, the postconviction court properly denied this claim. See Thompson,

796 So. 2d at 516 (requiring both prongs under Strickland be established in order

to prevail on ineffective assistance of counsel claim); <u>Smithers v. State</u>, 18 So. 3d 460, 464 (Fla. 2009) (requiring showing of actual bias in order to establish prejudice prong); <u>see also</u> <u>McCoy</u>, 113 So. 3d at 708 ("Further, a court evaluating a claim of ineffectiveness is not required to issue a specific ruling on the performance component of the test when it is evident that the prejudice component is not satisfied.").

### 2. Failure to Effectively Use Peremptory Challenges

Peterson also claims that the postconviction court erred in denying his ineffective assistance of counsel claim based on trial counsel's failure to strike biased jurors during jury selection. Regarding Peterson's specific argument that trial counsel should have exercised peremptory challenges to strike jurors Johnson, Breen, Walbolt, Tunsil, and Salgado, "[e]ffective assistance of trial counsel includes a proficient attempt to empanel a competent and impartial jury through the proper utilization of voir dire, challenges to venire members for cause, and the proper employment of peremptory challenges to venire members." <u>Nelson v. State</u>, 73 So. 3d 77, 85 (Fla. 2011).

The postconviction court found that trial counsel, an experienced defense attorney, made thoughtful inquiries to reach an intelligent decision in selecting the jury. This finding is supported by competent, substantial evidence. During the postconviction evidentiary hearing, Richard Watts, trial counsel for Peterson,

testified that it is most important to him in death-eligible cases to focus on the sentencing recommendation. He acknowledged that he has sometimes, including in the instant case, had to select jurors that were not favorable to the defense in the guilt phase, but were favorable in the penalty phase. Furthermore, Attorney Watts testified that in his experience of selecting nearly eighty jurors in death-eligible cases, he has never achieved seating a "perfect jury"; the same was true for the instant case.

Trial counsel attempted to empanel a competent and impartial jury that would have been favorable to the defense in the penalty phase. See id. This Court has recognized such a strategy as a reasonable one. See Dillbeck v. State, 964 So. 2d 95, 102-03 (Fla. 2007) (finding trial counsel adopted a reasonable trial strategy of avoiding a death sentence by attempting to seat jurors likely to recommend a life sentence); see also Burns, 944 So. 2d at 239. Peterson does not point to any particular venire member that would have been better qualified to serve in place of a seated juror. See Johnson v. State, 903 So. 2d 888, 896 (Fla. 2005) (rejecting appellant's argument that trial counsel could have used peremptory challenges in a different manner to obtain a more defense-friendly jury; "[s]uch speculation fails to rise to the level of ineffective assistance under Strickland . . . ."). Moreover, the record shows that Peterson heavily participated in selecting the jury panel and discussed with defense counsel his desires to retain certain jurors, which further

undermines Peterson's claim of ineffective assistance as to counsel's exercise of his peremptory challenges. See Gamble v. State, 877 So. 2d 706, 714 (Fla. 2004) ("[I]f the defendant consents to counsel's strategy, there is no merit to a claim of ineffective assistance of counsel.").

On balance, Peterson has failed to demonstrate that counsel acted beyond the broad range of reasonably competent performance under prevailing professional standards.   And, as discussed above, Peterson cannot demonstrate prejudice because no biased juror sat on his jury. See Phillips v. State, 894 So. 2d 28, 36 (Fla. 2004) (rejecting claim of ineffective assistance of counsel for failure to exercise two remaining peremptory challenges because defendant failed to demonstrate that his resentencing counsel's performance was deficient during voir dire and that such deficiency created a jury that was not impartial).  Accordingly, we affirm the postconviction court's denial of relief with respect to this claim.

**B.  Failure to Challenge In- and Out-of-Court Identifications**

Peterson argues that trial counsel was ineffective for not filing a pretrial motion to suppress various in- and out-of-court identifications of Peterson on the ground that the identifications were made in violation of Peterson's due process rights.  Peterson also claims ineffective assistance in that counsel should have elicited testimony from an eyewitness identification expert to discuss the factors

- 12 -

that potentially affected the accuracy of the witnesses' identifications in the instant case as well as the <u>Williams</u> rule cases.

Regarding counsel's failure to consult an eyewitness identification expert, Peterson has not demonstrated that counsel's failure to consult with such an expert in eyewitness identification was deficient. Peterson was identified by three different individuals who were at the scene of the crime on the night of the murder and were able to identify Peterson, including witnesses who identified Peterson before the robbery. The postconviction court explained that the witnesses'

> in-court identifications were bolstered in the instant case by the photo-pack identification of Peterson by another black male, Mr. Davis, who placed Peterson in the store just prior to the robbery; by Maria Soto who identified Peterson in court, both by facial features and by clothing as being the robber and as a person who had been in the store just prior to the robbery; and by Karen Smith's photo-pack identification of Peterson after the crime and in court.

As also found by the postconviction court, each of the <u>Williams</u> rule collateral crime cases introduced into evidence supports the witnesses' identifications. These three collateral cases, which each involved a signature modus operandi, were based on a combination of DNA, shoeprint and fingerprint evidence, videotape surveillance, and Peterson's possession of the stolen goods.

Further, it is well-established that trial counsel cannot be ineffective for failing to present cumulative evidence. <u>See</u> <u>Duckett v. State</u>, 918 So. 2d 224, 236 (Fla. 2005); <u>Marquard v. State</u>, 850 So. 2d 417, 429-30 (Fla. 2002); <u>Patton v. State</u>,

- 13 -

784 So. 2d 380, 393 (Fla. 2000). This rule is consistent with the Florida Evidence Code, which allows for the exclusion of cumulative evidence. See § 90.403, Fla. Stat. (2013). "Cumulative evidence" calls for a mere "repetition of testimony." See Gracy v. Atl. Coast Line R.R. Co., 42 So. 903, 906 (Fla. 1907).

The record shows that Attorney Watts familiarized himself with Dr. Brigham's area of expertise by reading eyewitness identification literature authored by Dr. Elizabeth Loftus and others. This, in conjunction with Attorney Watts' trial experience, training and attendance at related seminars, taught him the various areas in eyewitness identification testimony that are ripe for attack as well as the tactics to employ in attacking those areas. Further, there is competent, substantial evidence to support the postconviction court's findings that trial counsel effectively cross-examined each Big Lots witness regarding these points of attack, including their ability to see the perpetrator, their level of stress, the fact that a gun was in close proximity to their faces, and the passage of time. Moreover, the record shows that counsel reiterated this information at various points throughout closing arguments. Dr. Brigham's testimony, therefore, would have been repetitive, that is, cumulative, of the eyewitness identification evidence elicited by trial counsel. See Duckett, 918 So. 2d at 236; Marquard, 850 So. 2d at 429-30; Patton, 784 So. 2d at 393; see also Owen v. State, 986 So. 2d 534, 546 (Fla. 2008).

Accordingly, while it may have been useful to have consulted with an eyewitness identification expert, the failure is not deficient given all the circumstances of this case. Simply put, this is not the type of case in which there was a substantial likelihood of misidentification such that the failure to consult with an expert in eyewitness identification is deficient or where such testimony, if introduced, would have resulted in a reasonable probability of a different result, that is, one that undermines confidence in the outcome. Therefore, neither deficiency nor prejudice can be established.

As to Peterson's contention that trial counsel was ineffective for failing to file a motion to suppress the various identifications, this Court has recognized that counsel cannot be deemed ineffective for failing to file a pretrial motion to suppress identifications where the decision not to file a motion was a strategic one. Maharaj v. State, 778 So. 2d 944, 959 (Fla. 2000). In addition, we do not second-guess counsel's reasonable trial decisions. See Jones v State, 845 So. 2d 55, 65 (Fla. 2003). According to the record, the defense team strategized not to attack the eyewitness identifications in the collateral Williams rule cases, given that physical evidence existed which connected Peterson to those identifications. Rather, the defense strategized to attack the eyewitness identifications in the instant case because there was no physical evidence associated with Peterson. For instance, the trial transcript shows that counsel elicited cross-examination testimony from Big

- 15 -

Lots witness Karen Smith tending to show that her photo identification of the Big Lots perpetrator may have been tainted by a newsflash picture designated to be Peterson that she saw shortly after the robbery. Further, Attorney Watts testified that the focus was to attack the identifications in front of the jury so the jurors could perceive for themselves that the alleged identifications of Peterson were tainted. On review, it appears that trial counsel employed a reasonable trial strategy, given counsel's efforts to weaken the identifications in the instant case for which Peterson was actually charged. Therefore, because Peterson has failed to demonstrate ineffective assistance, we affirm the postconviction court's denial of this claim. See Maharaj, 778 So. 2d at 959.[1]

## HABEAS PETITION

In his petition for a writ of habeas corpus, Peterson alleges that appellate counsel was ineffective for erroneously conceding guilt of the three Williams rule cases, which prejudicially led to the denial of relief in this case. Consistent with the Strickland standard, to grant habeas relief for ineffective assistance of appellate counsel, this Court follows a two-prong test:

---

1. We also deny Peterson's claim that due to the cumulative effect of errors that occurred during the guilt and penalty phases, he is entitled to relief. Because Peterson has not demonstrated that he is entitled to relief on any of the claims he has raised, his cumulative effect claim is meritless. See Brown v. State, 846 So. 2d 1114, 1126 (Fla. 2003) ("Each of Brown's claims is insufficient under Strickland, and because this is the case, the claim for cumulative error fails as well.").

- 16 -

> [F]irst, whether the alleged omissions are of such magnitude as to constitute a serious error or substantial deficiency falling measurably outside the range of professionally acceptable performance and, second, whether the deficiency in performance compromised the appellate process to such a degree as to undermine confidence in the correctness of the result.

Schoenwetter, 46 So. 3d at 563. The defendant bears the burden of "alleging a specific, serious omission or overt act upon which the claim of ineffective assistance of counsel can be based. Id. (quoting Freeman v. State, 761 So. 2d 1055, 1069 (Fla. 2000)).

Our opinion in Peterson reflects that appellate counsel informed this Court that Peterson was "either convicted or pled guilty to each collateral robbery," including the Family Dollar, McCrory's, and Phar-Mor cases. See Peterson, 2 So. 3d at 153. However, the record indicates that Peterson was only charged and convicted in the Family Dollar case. Therefore, we find that appellate counsel was deficient for providing incorrect information to the Court. See Fla. Bar R. 4-3.3(a) (no lawyer shall knowingly make a false statement of fact or law to a tribunal). Nonetheless, we find that Peterson failed to demonstrate the second prong under Schoenwetter. Based on the record, the trial court found that there was clear and convincing evidence that Peterson was the perpetrator in the three collateral cases. Because we based our decision in Peterson to affirm Peterson's conviction on substantially identical factual findings, he cannot show that appellate counsel's misstatement "compromised the appellate process to such a degree as to undermine

- 17 -

confidence in the correctness of the result." See Schoenwetter, 46 So. 3d at 563.

Accordingly, we deny Peterson's petition for a writ of habeas corpus.

## CONCLUSION

Based on the foregoing analysis, we affirm the postconviction court's denial

of relief. We also deny Peterson's petition for a writ of habeas corpus.

It is so ordered.

POLSTON, C.J., and PARIENTE, LEWIS, QUINCE, LABARGA, and PERRY, JJ., concur.
PARIENTE, J., concurs with an opinion in which QUINCE, J., concurs.
CANADY, J., concurs in result.

NOT FINAL UNTIL TIME EXPIRES TO FILE REHEARING MOTION, AND IF FILED, DETERMINED.


PARIENTE, J., concurring.

I concur in the majority opinion affirming the postconviction court's denial

of relief and denying Peterson's habeas corpus petition, and agree that counsel's

failure to utilize an eyewitness identification expert in this case did not constitute

ineffective assistance of counsel. However, because I am concerned that our prior

jurisprudence has left the impression that testimony of an eyewitness identification

expert is generally inadmissible, I write separately to explain why such testimony

should be generally admissible to assist the jury in determining the reliability of

eyewitness identifications, especially in cases resting substantially or entirely on

eyewitness testimony.

- 18 -

Specifically, I would adopt the rationale of the Supreme Court of Connecticut in State v. Guilbert, 49 A.3d 705, 720 (Conn. 2012), and conclude that this Court's precedent, which suggests that factors affecting eyewitness testimony are within the common experience of jurors, is "out of step with the widespread judicial recognition that eyewitness identifications are potentially unreliable in a variety of ways unknown to the average juror." Indeed, as noted in Guilbert, the widely accepted scientific research available today "convincingly demonstrates the fallibility of eyewitness identification testimony and pinpoints an array of variables that are most likely to lead to a mistaken identification." Id. at 721. Accordingly, in cases involving eyewitness testimony, I encourage trial courts to truly exercise their discretion in determining whether to admit expert testimony on eyewitness identifications, which oftentimes has the potential to aid the jury in evaluating this extremely weighty evidence.

Among multiple claims and subclaims of guilt-phase ineffectiveness, Peterson claimed that his lawyer was ineffective in dealing with the eyewitness identification evidence presented to the jury. Although I agree with the majority that the defense attorney's failure to consult with an eyewitness identification expert did not constitute ineffective assistance of counsel in this case, I remain concerned that this Court's prior precedent may erroneously lead some practitioners and judges to the conclusion that this type of expert testimony is per

se inadmissible. In actuality, the admissibility of expert testimony regarding the reliability of eyewitness identifications is properly determined on a case-by-case basis depending on the specific factual circumstances of the case. See Johnson v. State, 438 So. 2d 774, 777 (Fla. 1983) (adopting an abuse of discretion standard for determining whether the trial court erred in excluding expert testimony on eyewitness identification). Moreover, although trial counsel's failure to consult with an expert in eyewitness identification was not deficient in this case, it is simply against the weight of scientific authority and the recent decisions of courts throughout the country that have addressed this issue to conclude that jurors never require "special knowledge or experience" to determine the reliability of eyewitness identification. Id.

As the Supreme Court of New Jersey recognized in State v. Delgado, 902 A.2d 888, 895 (N.J. 2006), "[m]isidentification is widely recognized as the single greatest cause of wrongful convictions in this country." For that reason, the Innocence Commission appointed by the Florida Supreme Court to analyze the causes of wrongful convictions chose eyewitness misidentification as its first area of study. Florida Innocence Commission, Final Report to the Supreme Court of Florida 18 (2012). Indeed, citing analysis undertaken by the Innocence Project, the Florida Innocence Commission noted that eyewitness misidentification has played

a role in more than seventy-five percent of convictions that were subsequently overturned through DNA testing.  Id.

Thirty-one years ago, prior to the scientific studies available today pointing out the flaws in eyewitness testimony, I can understand how this Court might have concluded that "a jury is fully capable of assessing a witness' ability to perceive and remember . . . without the aid of expert testimony."  Johnson, 438 So. 2d at 777.  However, even in reaching this conclusion, rather than electing a per se rule of exclusion, this Court adopted an abuse of discretion standard.  Id.

Unfortunately, though, this Court offered no real guidance as to how a trial court should determine the admissibility of an eyewitness identification expert and even indicated that there was no reason to admit such testimony, stating as follows:

> A trial court has wide discretion concerning the admissibility of evidence and the range of subjects about which an expert can testify. Expert testimony should be excluded when the facts testified to are of such nature as not to require any special knowledge or experience in order for the jury to form its conclusions.  We hold that a jury is fully capable of assessing a witness' ability to perceive and remember, given the assistance of cross-examination and cautionary instructions, without the aid of expert testimony.

Id. (citations omitted).  As I have previously explained, "[i]n so holding, we signaled to trial judges that expert testimony in this area is unnecessary because the assessment of eyewitness identification is within the common experience of jurors."  Simmons v. State, 934 So. 2d 1100, 1123-24 (Fla. 2006) (Pariente, C.J., specially concurring).  However, subsequent research in the area of eyewitness

- 21 -

identification has clearly demonstrated that the reliability of eyewitness

identification testimony is subject to a multitude of factors, the effects of which are

often not within the realm of an average juror's general knowledge.

The powerful impact that eyewitness identification evidence has on jurors

cannot be overstated. That such testimony has the potential to sway a jury towards

a conviction provides even more reason for this Court to take note of subsequent

studies on the issue of eyewitness identification that have undermined this Court's

conclusion in Johnson that expert testimony is unnecessary for a jury to assess

eyewitness identification evidence. As I have previously noted:

> For example, common sense would lead us to believe that greater
> certainty by an eyewitness in making an identification corresponds to
> greater accuracy. Yet research shows that a witness's degree of
> certainty correlates weakly, at best, with the accuracy of the
> identification. See Elizabeth Loftus & James Doyle, Eyewitness
> Testimony: Civil and Criminal § 3–12, at 67 (3d ed. 1997) ("The
> consensus of the literature that deals with [whether eyewitness
> confidence is an indication of eyewitness accuracy] seems to indicate
> that eyewitness confidence is not a very good indicator of eyewitness
> accuracy."). In fact, the "certainty an eyewitness expresses in his
> identification can be a misleading indicator of the identification's
> accuracy." Gary L. Wells, Eyewitness Identifications: Scientific
> Status, in Science In the Law: Social and Behavioral Science Issues
> 391, 412 (David L. Faigman et al. eds., 2002). Other features of
> eyewitness unreliability, such as difficulty identifying persons of
> another race, have also become well established. See Loftus & Doyle,
> supra, § 4–9, at 86; Wells, supra, at 404.

Simmons, 934 So. 2d at 1124 (Pariente, C.J., specially concurring).

Since our decision in Simmons, courts throughout the country have continued to take notice of the growing body of scientific research on eyewitness identifications and have repeatedly recognized that expert testimony on eyewitness identification provides jurors with information that is beyond an average juror's general knowledge. For example, only three years after this Court's decision in Simmons, the Supreme Court of Utah, in concluding that a trial court had abused its discretion by excluding expert witness testimony, held that "the testimony of a qualified expert regarding factors that have been shown to contribute to inaccurate eyewitness identifications should be admitted whenever it meets the requirements of [the Utah rules of evidence]." State v. Clopten, 223 P.3d 1103, 1112 (Utah 2009). Further, the Supreme Court of Utah went on to explain that it expected its decision in Clopten to "result in the liberal and routine admission of eyewitness expert testimony." Id.

The Supreme Court of Connecticut reached a similar conclusion in Guilbert, noting that while the court had previously concluded that expert testimony on eyewitness identification was inadmissible because "the reliability of eyewitness identification is within the knowledge of jurors," State v. Kemp, 507 A.2d 1387, 1389 (Conn. 1986), its prior decisions on the issue were "out of step with the widespread judicial recognition that eyewitness identifications are potentially unreliable in a variety of ways unknown to the average juror." Guilbert, 49 A.3d at

720. Relying on "extensive and comprehensive research, as reflected in hundreds of peer reviewed studies and meta-analyses," the Supreme Court of Connecticut explained that scientific evidence "convincingly demonstrates the fallibility of eyewitness identification testimony and pinpoints an array of variables that are most likely to lead to a mistaken identification." Id. at 721. Thus, the Supreme Court of Connecticut concluded that "[m]any of the factors affecting the reliability of eyewitness identifications are either unknown to the average juror or contrary to common assumptions, and expert testimony is an effective way to educate jurors about the risks of misidentification." Id. at 731.

Citing the Supreme Court of Connecticut's decision in Guilbert, the Supreme Court of Oregon stated that "courts around the country have recognized that traditional methods of informing factfinders of the pitfalls of eyewitness identification—cross-examination, closing argument, and generalized jury instructions—frequently are not adequate to inform factfinders of the factors affecting the reliability of such identifications." State v. Lawson, 291 P.3d 673, 695 (Or. 2012) (citing Guilbert, 49 A.3d at 705). In light of this conclusion, the Supreme Court of Oregon explained that "the use of experts may prove vital to ensuring that the law keeps pace with advances in scientific knowledge, thus enabling judges and jurors to evaluate eyewitness identification testimony according to relevant and meaningful criteria." Id. at 696.

These decisions represent the modern trend among courts that have addressed the admissibility of expert testimony on eyewitness identification. As noted by the Supreme Court of Connecticut, there is now a "widespread judicial recognition that eyewitness identifications are potentially unreliable in a variety of ways unknown to the average juror." Guilbert, 49 A.3d at 720. By bringing to light research findings on factors that affect an eyewitness identification, which would otherwise be beyond a juror's general knowledge, expert testimony within this area can assist the trier of fact in correctly determining a defendant's guilt.

Given the widespread judicial acceptance of the fact that the reliability of eyewitness testimony is subject to factors beyond the common knowledge of jurors, I once again encourage trial courts to "truly exercise their discretion as to the admission of this testimony." Simmons, 934 So. 2d at 1126 (Pariente, C.J., specially concurring). As the burgeoning body of scientific research indicates and courts across the country increasingly recognize, expert witness testimony on the reliability of eyewitness identifications can be a "powerful tool in helping the criminal justice system achieve its goal of convicting the guilty while acquitting the innocent." Id. It is my hope that when this Court is squarely faced with the issue in a direct appeal case, we will seize the opportunity to recede from Johnson, join the modern trend, and hold that eyewitness identification expert testimony

should be generally admissible, especially in cases resting substantially or entirely on eyewitness testimony, as long as the other predicates for admissibility are met.

QUINCE, J., concurs.

Two Cases:

An Appeal from the Circuit Court in and for Pinellas County,
    Linda Ruth Allan, Judge - Case No. CRC00-05107CFANO
And an Original Proceeding – Habeas Corpus

David Dixon Hendry, Assistant CCRC, Capital Collateral Regional Counsel-Middle Region, Tampa, Florida,

    for Appellant/Petitioner

Pamela Jo Bondi, Attorney General, Tallahassee, Florida and Katherine Vickers Blanco, Assistant Attorney General, Tampa, Florida,

    for Appellee/Respondent