CASANUEVA, Judge.
Jerry Tyrone Jones appeals his judgments and sentences for two counts of first-degree murder and one count of attempted first-degree murder. Although we conclude that the-trial court abused its discretion in excluding expert testimony regarding factors that may affect the reliability of eyewitness identifications, we nevertheless affirm Mr. Jones’ convictions because such error was harmless in this case.

FACTS AND PROCEDURAL HISTORY

Mr. Jones was found guilty of the first-degree murders of Cabretti Wheeler and *1087 Kyle Ellis and the attempted first-degree murder of Gary Small, .the only eyewitness to the crimes. During Mr. Jones’ trial, Mr. Small testified that on September 6, 2008, he was living in a converted loft on the second floor of a building in which Dats Right Audio was also located. On that day, he arrived home a little before midnight and briefly spoke with the other two victims, Mr. Ellis and Mr. Wheeler, who were in a recording studio on the first floor of the building. Mr. Small then went to his apartment on the second floor, and he soon thereafter heard popping sounds coming from the first floor that sounded like fireworks. He went downstairs to investigate and when he opened the door, there was a man standing at the door with a gun. The man had his arm already raised when Mr. Small opened the door, and he hit Mr. Small several times in the face and head with the gun. Mr. Small struggled with the man and was able to escape into a nearby bathroom.
Mr. Small testified that he was in a panic. His head was bleeding heavily and he tried to wash the blood from his eyes. He waited five to ten minutes before coming out of the bathroom and when he did not see the man, Mr. Small started to step out of the bathroom. At that point, he noticed the same man coming back in the room. The man shot Mr. Small twice and when Mr. Small fell to the ground, the man walked over to him and shot him again. Mr. Small testified that he did not immediately feel pain from the gunshot wounds because he was in a state of shock due to what was happening. He tried to remain still, pretending to be dead, until the man left the building. Mr. Small then went outside and hid in a retention pond. He saw a car with two people leaving the area.
Mr. Small then called 911 and the recording of the telephone call was'played for the jury. During the 911 call, Mr. Small indicated that he saw who shot him but he did not recognize the person.
' Mr. Small’s ability to identify Mr. Jones as the shooter was a contested issue during trial. It appears from the record that Mr. Jones has a significant dent in his forehead, and Mr. Small’s description of a dent on the shooter’s forehead was made an issue at trial. When Mr. Small first described the suspect to Detective Johnson while he was in the hospital, he did not know if he told the detective that the suspect had a dent in his forehead: “I don’t believe I did, sir, but I was also in a lot of shock.” Mr. Small was in the hospital and was receiving painkillers at that time. However, when he was asked to help Detective Snipes create a composite sketch of the suspect about seven weeks after the murders, they talked about the prominent dent on the suspect’s forehead. Mr. Small remembered that the software that the detective used to create the composite would not allow for an image to be created reflecting the forehead scar.
Mr. Small testified that he had three opportunities to see Mr. Jones’ face: during the scuffle, when Mr. Jones came back in the room through the back door and shot him, and when he looked up at Mr. Jones before being, shot again. Mr. Small testified that before the scuffle, he got a good look at Mr. Jones. “He was right there in front of my face- in bright light, sir.” Mr. Small identified Mr. Jones in court as. the person who shot him.
Sergeant' Snipes testified that he met with Mr. Small on October 30, 2008, and asked him to help complete a composite drawing of the man who shot him. Mr. Small told him that the suspect had a large dent in his forehead. However, the composite was created using a computer program and, although the program allows police to create scars, it does- not necessar *1088 ily look natural. Sergeant Snipes testified, “It actually kind of distorts the picture a little bit. So we knew that ... [the suspect] was wearing a hat. We tried to make the composite look the best that we possibly could. So we went with the hat instead of the dent.” He testified that the program could not depict both a scar on the forehead and a hat.
Detective Greene testified he was assigned to the case on April 2, 2010, and it was considered to be a cold case at the time. He found a picture of Mr. Jones in the sheriffs office file. Detective Greene researched Mr. Jones’ vehicle records and learned that Mr. Jones once had a 1994 gold Oldsmobile Cutlass Ciera that matched the description of the car that Mr. Small saw leaving the murder scene. Mr. Jones was stopped for a traffic infraction while driving the Oldsmobile two months before the murders, and the former owner of the car identified Mr. Jones in a photo pack as the person who purchased the car.
Detective Greene also showed Mr. Small a photo pack and read to him the standard instructions pertaining to identifying someone in a photo pack. All of the men in the photo pack had a dent in their forehead. Mr. Small said that he. was ninety-nine percent, sure that Mr. Jones was the person who shot him. He asked to see a larger, color photo of Mr. Jones because he wanted to make sure that he was correct. When he was shown the larger photograph, Mr. Small said that he could identify Mr. Jones as the shooter. Detective Greene testified that when,, he was assigned to. the case, none of the previous police reports indicated that the suspect had a scar or dent in his forehead.
Mr. Small testified that when Detective Greene showed him the photo pack in which all of the men had a dent in their forehead, he identified Mr. Jones. However, Mr. Small asked the detective for a larger, color photo of Mr. Jones, because he wanted to be positive about the identification. Mr. Small testified that his vision is good and that the room in which he was shot had large fluorescent lights.[1] Mr. Small testified that there was no doubt in his mind that Mr. Jones was the person who shot him. ■
Mr. Small also testified that when Detective Greene showed him a picture of Mr. Jones’ car, Mr. Small believed that it looked like the car that he had seen leaving the area after the murders. Mr. Small testified that the Oldsmobile’s front emblem was damaged. After seeing the picture of Mr. Jones’ car, Mr. Small remembered seeing Mr. Jones in the shop downstairs and remembered having a brief discussion with him about fixing the emblem on his car. One of the pins holding the emblem was broken and the emblem was pivoting and oh the verge of falling off. Mr. Small explained that when he called 911 and indicated that he did not recognize the shooter, he had been shot five times and, understandably, was under a lot of stress.

EXPERT TESTIMONY ON EYEWITNESS IDENTIFICATION

Mr. Jones arranged for Dr. Brigham to testify at trial regarding psychological factors that contribute to erroneous eyewitness identifications.[2] The State filed a *1089 motion in limine to exclude Dr. Brigham’s testimony and argued that he should not be permitted to testify regarding factors that may influence an eyewitness’s identification, because the jury would receive instructions regarding what factors they should consider in weighing the- credibility of eyewitness identifications and that expert testimony would invade the province of the jury. It also asserted that, because Dr. Brigham would not opine on whether the eyewitness identification was correct'in this case, his testimony did not comply with section 90.702(3), Florida - Statutes (2013), which states that the expert must apply “the principles and methods reliably to the facts of the case.” The .State specifically asserted, “I don’t think we need a Frye[3] hearing,” and neither a Frye hearing nor a Daubert[4] hearing was conducted. Mr. Jones proffered the deposition of Dr. Brigham and the only case law that the attorneys relied on was Simmons v. State, 934 So.2d 1100 (Fla.2006).[5]
The trial court granted the' motion in limine, ruling that
at most, the doctor’s testimony would be unnecessary, especially under these circumstances that these are common factors that we all understand about identification of individuals, that counsel has the opportunity to cross-examine these witnesses, especially as to what Dr. Brigham has informed them of these different factors and circumstances, and that the instruction, 3.9(f), clearly gives the factors to be considered in this — in the circumstances that the jury can consider, and that’s coming from the court.
The trial court stated, “These are all common things. We all understand how identifications occur in life and how memories are. You don’t need an expert to tell [you that].”

DISCUSSION

'We review the trial court’s ruling on the introduction of this testimony for abuse of discretion. We conclude that the trial court abused its discretion in excluding-Dr. Brigham’s testimony based on its finding that the testimony would be unnecessary because it concerned common factors that everyone understands about eyewitness identification.[6]
The issue presented here can trace its historical lineage to McMullen v. State, 714 So.2d 368 (Fla.1998), which in fact also involved-the -proffered ■ testimony of Dr. Brigham. In McMullen, our supreme court reaffirmed that the standard of review of a trial court’s ruling on the introduction of this testimony is one of abuse of discretion, stating, “Expert testimony should be excluded when the facts testified to are of such nature as not to require any special knowledge or experience in order for the jury to form its conclusions.” Id. *1090 at 371 (quoting Johnson v. State, 438 So.2d 774, 777 (Fla.1983)). The supreme court concluded its McMullen opinion by holding
that the admissibility of expert testimony regarding the reliability of eyewitness testimony is left to the sound discretion of the trial judge. By so holding, we are continuing to align ourselves with a majority of other jurisdictions. Under our evidence code, § 90.702, Fla. Stat. (1997), the trial judge, in considering the admissibility of this type of evidence, must evaluate whether the evidence will assist the trier of fact in understanding the ■ evidence or in determining a fact in issue.
Id. at 372.
McMullen, a 1998 decision, was addressed by the supreme court in 2006 in Simmons v. State, 934 So.2d 1100 (Fla.2006). The court, relying on Johnson and McMullen, reaffirmed that it continued to follow the discretionary standard of review. Finding that Dr. Brigham’s proffered testimony would be no different than his proposed testimony, it concluded that “the trial judge did not abuse his discretion in disallowing Dr. Brigham’s testimony.” Id. at 1117. No new analysis was presented.
In 2014, the supreme court considered the admissibility of eyewitness identification testimony in the postconviction context. Peterson v. State, 154 So.3d 275 (Fla.2014). Interestingly, in denying the claim, the court stated:
[T]his is not the type of case in which there was a substantial likelihood of mis-identification such that- the failure to consult with an expert in eyewitness identification is deficient or where such testimony, if introduced, would have resulted in a reasonable probability of a different result, that is, one that undermines confidence in the outcome.
Id. at 283.
However, Justice Pariente noted in a concurring opinion that “expert testimony on eyewitness identification provides jurors with information that is beyond an average juror’s general knowledge.” Id. at 287 (Pariente, J., concurring). Justice Pariente noted that it is contrary to scientific authority and recent decisions of courts throughout this country to conclude that juries never require special knowledge or experience to weigh the reliability of an eyewitness identification. Id. at 286.
[Rjesearch in the area of eyewitness identification has clearly demonstrated that the reliability of eyewitness identification testimony is subject to a multitude of factors, the effects of which are often not within the realm of an average juror’s general knowledge.
The powerful impact that eyewitness identification evidence has on jurors cannot be overstated. That such testimony has the potential to sway a jury towards a conviction provides even more reason for this Court to take note of subsequent studies on the issue of eyewitness identification that have undermined this Court’s conclusion in Johnson that expert testimony is unnecessary for a jury to assess eyewitness identification evidence.
Id. at 286-87.
In determining whether an eyewitness’s identification in a case will require any special knowledge in order for a jury to form its conclusions and whether expert testimony would assist the jury in understanding the evidence, trial courts should consider the presence of certain circumstances that, according to literature in the field, could impact a witness’s identi *1091 fication.[7] Circumstances that could affect a witness’s identification include the following:
• Time. A person’s memory tends to diminish over a period of time. See State v. Guilbert, 306 Conn. 218, 49 A.3d 705, 722 (2012). Here, over two years went by between the date of the offense and the date Mr. Small was asked to identify Mr. Jones in a photo pack.
• Stress. High stress at the time of observation tends to have a negative impact on perception and memory. See id. It is not disputed that Mr. Small was subject to a highly charged event and was under a considerable amount of stress.
• Cross-racial identifications. Sometimes identifications made by a person of a different race can be less accurate than same race identifications. See id. Mr. Small and Mr. Jones are not the same race.
• Unconscious transference. A person can confuse a suspect with someone that person has seen before, but with whom they are not familiar. See id. Mr. Small testified that he later realized that Mr. Jones had come into the auto shop on a previous occasion.
• Weapons. We note that an identification can be-hampered by a witness’s focus on a weapon. - See id. Here, the suspect had a weapon during the entire incident.
The record here reflects the presence of not one but rather all of these variables. Dr. Brigham’s testimony could have assisted the jury in understanding how the above variables may have affected the reliability of the eyewitness identification in this case.
Mr. Jones proffered the deposition testimony of Dr. Brigham, an emeritus professor of psychology at Florida State University, regarding psychological factors believed to affect the reliability of eyewitness identification. According to Dr. Brigham, psychological factors, which are largely unknown to laypersons, can affect the accuracy of eyewitness identifications.
For example, Dr. Brigham testified that when a weapon is involved, research shows that a person tends to focus their attention on the weapon and less on the face of the person holding it. This phenomenon, called “weapon focus,” makes it harder to identify the person later. Dr. Brigham also testified that when the assailant is a different race than the victim, a good deal of research indicates that identifications are more likely to be incorrect. However, the more cross-race experience a witness has, the better they are at identifying a person of another race.
Dr. Brigham testified in his deposition that when an eyewitness is asked to-do a composite sketch of his attacker, research shows that the act of creating a composite interferes with the witness’s later ability to identify the - person from a photo lineup, presumably because in making a composite, the person focuses on particular features, such as the eyes, nose and so forth, and that leads to what has been called “featural encoding.” Research shows that *1092 memory from featural encoding is not as accurate as memory from “configural” or “holistic encoding” where the face' is brought up as a whole unit. He testified that “making a composite [switches] that mental image from the holistic encoding into featural encoding, making it harder later to identify the person from a lineup.”
According to Dr. Brigham, research also shows that if there is a long period of time between the crime and the identification, there is a greater likelihood of errors, because of the. inclination to forget and also because anything that takes place between the time of the incident and the identification is encoded and' can change that memory. He testified that thinking about the incident, talking to people, seeing things in the media, and creating a composite can all change the memory without the person being aware of it.
Dr. Brigham testified that if the eyewitness has previously seen someone in a situation unrelated to the crime, it could have two possible effects on the identification. If the witness knows the person well, it will be easier for the witness to identify him. However, if the witness has occasionally seen the person but is not familiar with' them, it could result in “unconscious transference,” also known as “source confusion” or “memory blending.” If a person is familiar to a witness in one context, the witness may misidentify them in another context.
Dr. Brigham further testified that the accuracy of facial identifications decreases in very stressful situations. He testified that while a moderate amount of stress may enhance a person’s memory, a high amount of stress will have the opposite effect.
Many of these factors that could impact an eyewitness’s identification are present in this case. Notably, a weapon was involved and the situation was extremely stressful. Further, Mr. Small was asked to help complete a composite sketch, and over two years went by between the date of the offense and the date Mr. Small was asked to identify Mr. Jones in a photo pack. Additionally, Mr. Small testified that he remembered Mr. Jones bringing in his car to get the emblem fixed, but it does not appear that he knew Mr. Jones well. Because so many factors were present in this case that could have affected Mr. Small’s identification of Mr. Jones, it was an abuse of discretion to exclude the expert’s testimony. See Peterson, 154 So.3d at 286 (Pariente, J., concurring) (“[T]he admissibility of expert testimony regarding the reliability of eyewitness identifications'is properly determined on a case-by-case basis depending on the specific factual circumstances of the case.”). We cannot assume that the average juror would be aware of the variables concerning eyewitness identification .and memory about which Dr. Brigham would have-testified.
Several courts from other jurisdictions have recognized the importance of expert testimony on eyewitness identifications. In People v. McDonald, 37 Cal.3d 351, 208 Cal.Rptr. 236, 690 P.2d 709, 726 (1984), overruled on other grounds, People v, Mendoza, 23 Cal.4th 896, 98 Cal.Rptr.2d 431, 4 P.3d 265 (2000), the court held that the trial court abused its discretion in excluding such testimony because, although jurors may be aware of some psychological factors influencing eyewitness identifications, the information now available on this issue is beyond the common experience of most jurors and, in some cases, expert opinion could assist the jury. Id. at 721.[8] *1093 The court noted that the testimony of a single witness is adequate to prove identity because an eyewitness identification is generally considered reliable; however, eyewitness identification testimony is often dubious, given the expansive research suggesting that eyewitness identifications are not reliable. Id. at 717.
In State v. Chapple, 135 Ariz. 281, 660 P.2d 1208, 1224 (1983), superseded by statute on other grounds as recognized in State v. Benson, 232 Ariz. 452, 307 P.3d 19 (2013), the court similarly held that the trial court abused its discretion in excluding the testimony of an expert regarding eyewitness identifications. The court noted that, although the law recognizes the inherent danger in eyewitness testimony, it is difficult to determine if the average juror has the same inherent caution of such identifications. Id. at 1220. .“Experimental data indicates that many jurors ‘may reach intuitive conclusions about the reliability of [such] testimony that psychological research would show are misguided.’” Id. (quoting Fredric D. Woocher, Note, Did Your Eyes Deceive You? Expert Psychological Testimony on the Unreliability of Eyewitness Identification, 29 Stan. L.Rev. 969, 1017 (1977)).
Similar to the present case, the trial court in Chappie based its ruling on the belief that “scientific theory regarding the working of human memory could be developed on cross-examination and effectively argued without evidentiary foundation,” Id. at 1224. The appellate court held that this reasoning was incorrect because there “were a number of substantive issues of ultimate fact on- which the expert’s testimony would have been of significant assistance.” Id.
In Blasdell v. State, 384 S.W.3d 824, 830 (Tex.Crim.App.2012), the court noted, “expert testimony with respect to the reliability of eyewitness identification will be deemed ‘relevant’ so long as it illustrates how particular identification procedures ‘might be affected’ by various ‘factors’ or ‘circumstances,’ or ‘how various factors in eyewitness-identification processes can contribute to dissociation in eyewitnesses.’” (citing Tillman v. State, 354 S.W.3d 425, 438 (Tex.Crim.App.2011)) (footnotes omitted). The Blasdell court held that the testimony of an eyewitness identification expert is relevant if the expert can testify that the circumstances surrounding a particular event have been empirically demonstrated to have the potential to cause a mistaken identification. Id. at 830.
Because of the presence of numerous factors that have a propensity to impact a proper memory recall in this case, we conclude that expert testimony on eyewitness identifications would have assisted the trier of fact in evaluating the presented testimony and in reaching a conclusion.- With the presence of so many factors there arguably exists a possibility of misidentification.
Accordingly, we hold that, because of the presence of numerous factors impacting -the issue of identification, it was an abuse of discretion for the trial court to exclude Dr. Brigham’s testimony. We are not called upon to and do not decide here whether the presence of a lesser number of factors compels the same outcome.

HARMLESS ERROR ANALYSIS

We conclude that the error in excluding Dr. Brigham’s testimony was harmless. To establish that an error was harmless, the State must “prove beyond a reasonable doubt that the error .complained of did not contribute to the verdict *1094 or, alternatively stated, that there is no reasonable possibility that the error contributed to the conviction.” State v. DiGuilio, 491 So.2d 1129, 1135 (Fla.1986). “[T]he applicable test ‘is not a sufficiency-of-the-evidence, a correct result, a not clearly wrong, a substantial evidence, a more probable than not, a clear and convincing, or even an overwhelming evidence test.’ ” Cooper v. State, 43 So.3d 42, 43 (Fla.2010) (quoting DiGuilio, 491 So.2d at 1139).
In addition to the eyewitness identification, other evidence points to Mr. Jones as the perpetrator, including the evidence relating to Mr. Jones’ car, a telephone call Mr. Jones made in jail while awaiting trial, and the trial testimony of Krystal Coston.
When Detective Greene spoke with Mr. Jones, he spontaneously denied ownership of the Oldsmobile. During their conversation, Detective Greene asked Mr. Jones for the name of the other person at the scene. Sometime later, Mr. Jones called someone from jail and a recording of that call was played at trial. During the call, Mr. Jones told another person that the “dude survived, he pointed me out.” He also said, “I f— up, my n — . It is what it is. I did what I did. Man, I lived my life.” Regarding the car, “He talking about a car that I done got rid of. You feel me? That’s the only thing he got linking me to that.” Regarding the questions as to who was with him that night, Mr. Jones stated in the phone conversation,
I do my shit all by myself any and every time.... Oh, you’d rather — because my n— who did it with me, you feel me, he — he—you feel me? I can’t do that, bro. You know that ain’t me, bro. And that’s my n — .... What the f— I look like, a bitch, my n — ? I’m going, out like a G, man.[The detectives] got me confused with some of these peon-ass n — .I’m not trying to get my (unintelligible) involved in this.I got this one, man. I’ll take this one.
The State also presented the testimony of Krystal Coston, who testified that she met Mr. Jones while they were both in jail.[9] She asked him if he committed the murders, and he admitted that he committed the murders and said that the offenses arose out of a “respect” issue. Mr. Jones admitted his guilt during the recorded telephone call and also to Ms. Coston.

CONCLUSION

We conclude, after applying DiGuilio, that the State here has carried its burden of proof, and any error in excluding Dr. Brigham’s testimony was harmless.
Affirmed.
ALTENBERND and CRENSHAW, JJ., Concur.

, Mr. Small was forty-nine years old at the time of trial.

. Respite the fact that the State had known about this testimony, and in fact had taken Dr. Brigham’s deposition on March 20, 2013, it waited until June 24, 2013, the day before trial, to file a motion in limine to exclude his testimony. At trial, the State raised the issue right before jury selection was to begin. The trial court and the parties decided to address *1089 the issue after the jury was sworn but before opening statements were made.

. Frye v. United States, 293 P. 1013 (D.C.Cir.1923).

. Daubert v. Merreli Dow Pharm., Inc., 509 U.S. 579, 113 S.Ct. 2786, 125-L.Ed.2d 469 (1993). . .

. Mr. Jones’ counsel opted to rely on the pretrial deposition of Dr. Brigham in support of the defense’s contention that the witness’ testimony was admissible'. The pretrial deposition was taken by the State in anticipation of trial.. We observe that the deposition likely did not enhance the trial court's ability to-make a decision.

.We recognize that the State’s failure to raise this issue in advance placed the trial’ court under a time constraint to rule on the testimony and the court -was only given one case as guidance. Similarly, Mr. Jones’ attorney was . not- given much notice that this issue would be addressed at trial and cannot be faulted for failing to provide the trial court with case law or related articles.

. We note that Dr. Brigham’s testimony is consistent with the current state of the relevant studies. See Gary L. Wells, Eyewitness Identifications: Scientific Status, in Science In the Law: Social and Behavioral Science Issues 391, 412 (David L. Faigman et al. eds., 2002); Henry F. Fradella, Why Judges Should Admit Expert Testimony on the Unreliability of Eyewitness Testimony, 2006 Fed. Cts. L.Rev. 3 (June 2006); Jared T. Dotson, Note, The Linchpin of Identification Evidence: The Unreliability of Eyewitnesses and the Need for Reform in West Virginia, 117 W. Va. L.Rev. 775 (2014); Matthew S. Foster, Comment, I’ll Believe It When You See It, 60 Loy. L.Rev. 857 (2014).

. See also United States v. Smith, 621 F.Supp.2d 1207, 1215 (M.D.Ala.2009) ("The jury’s decision-making process can Be en *1093 hanced by learning how these factors combine to impact perception and memory.”).

. Mr. Jones was in jail awaiting trial on this case.